THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY WHITTAKER, Defendant-Appellant.

First District (5th Division)   No. 1—88—2984

Opinion filed May 25, 1990.

Charles I. Schwartz, of Northbrook, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Paula Carstensen, and Catherine Bernard, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

After a bench trial, defendant, Larry Whittaker, was convicted of armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2), armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2), and aggravated battery (Ill. Rev. Stat. 1987, ch. 38, par. 12—4) and sentenced to six years in prison. On appeal, he contends that he was denied effective assistance by his privately retained counsel. We affirm.

At trial, the State waived opening statement, the defense reserved its statement, and the State then called its first witness, Donald Koehler, the complainant. Koehler testified that at about 8:30 p.m. on February 9, 1987, he went to visit his friend, Wilbur Askew,

who lived in a two-story boarding house at 1120 Emerson in Evanston. When he arrived, he climbed the staircase leading to Askew's second-floor room. When he got to the top of the stairs, defendant suddenly opened a door and tried to grab a bag, containing two quart bottles of beer, which Koehler was carrying. Koehler asked defendant what he was doing and then attempted to leave. When Koehler got about three to four steps down the stairs, defendant grabbed him by the collar. At this point, Askew opened his door and defendant released Koehler. Koehler then followed Askew into his room and placed his bag of beer on a dresser. Without Koehler's knowledge, defendant had followed them into the room and, while Koehler's back was turned, pushed Koehler into a chair. Defendant then mumbled something to Askew about his friend and asked Koehler if he had anything on him. Defendant searched Koehler and took a pack of cigarettes from his pocket. He then grabbed Koehler's head and smashed it into the wall, four to five times, leaving a large circular hole in the wall.

Defendant thereafter pulled a knife, with a four-inch blade, from his pocket and placed the blade against Koehler's throat, cutting his throat and repeatedly threatening to kill him. When Askew told defendant to take it easy and put his knife away, defendant again mumbled something and threatened to cut Koehler's nose off. He then thrust the knife into Koehler's left nostril, creating a sharp pain and causing bleeding as he withdrew it. Defendant also cut Koehler across the bridge of his nose. Askew got a rag to help stop the bleeding. Defendant then took Koehler's beer and cigarettes and left the room.

After defendant left, Koehler told Askew he had to leave before defendant came back and he then jumped out the window, which was 16 feet from the ground. Koehler landed on the seat of his pants and sustained an injury, later diagnosed as a fracture to his lower lumbar region. He then limped to a local restaurant and called the police. When the police arrived, they went back with Koehler to Askew's building, and there they found defendant in another room, drinking Koehler's beer, and arrested him. After the arrest, Koehler went to the hospital.

On cross-examination, Koehler stated that he had never seen defendant before the incident. He acknowledged that he said nothing to Askew, his good friend, about defendant's grabbing him on the staircase and did not ask for Askew's help when defendant menaced him with the knife. He further stated that he never put his hands on defendant or made any motions toward him throughout the incident. He also said that he went to the hospital for treatment after the incident but received no bandages, stitches or packing for his nose, and

he was able to walk the six or seven blocks from the hospital to the police station without the aid of a cane or crutches.

Wilbur Askew, testifying for the State, stated that at about 8:40 or 8:45 p.m. on February 9, he was lying in his room when he heard a commotion at the front door. He opened the door and saw Donald Koehler and defendant, whom he knew from a previous meeting, standing on the staircase which led to the second floor of his building. Koehler came forward into Askew's room, Askew followed him and defendant then came in uninvited. Askew's testimony essentially corroborated Koehler's testimony except he also testified that defendant admonished him that he should tell his guests how to conduct themselves. He further stated that there was no telephone in his room and that the only means of egress from his room were through a single door or the window.

On cross-examination, Askew stated that he had been on medical supervision for five years and was taking cogentin twice daily for a nervous condition and thorazine once a month as rehabilitation from alcohol and drug abuse. At the time of the incident involved in this case, he had taken his cogentin but not the thorazine. He also denied being in the kitchen area of the boarding house, located in an area separate from his room, with his neighbor, Robert Sanders, at any time during the evening of February 9.

Assistant State's Attorney Winninger testified for the State that she interviewed defendant at the Evanston police department during the early morning hours of February 10 and he told her that he had "whooped" the complainant "after he started fagoting at me." He further informed her that he did carry a knife, which he used at work and for personal protection, but denied pulling the knife or using it on Koehler. She also observed Koehler at the police station and noticed that he had cuts on the bridge of his nose, a laceration on the inside and bottom of his nose, an injury to the right side of his neck, a knot on the back side of his head and a limp in his walk.

After Winninger's testimony and the admission of a wooden handled, four-inch knife which the police found on defendant when they arrested him, the State rested.

After the court denied defendant's motion for a directed finding, the defense called its first witness, Robert Sanders, without making an opening statement. Sanders testified that he was Askew's neighbor and had seen him in the kitchen area of the boarding house at about 8:15 p.m. on February 9. He knew it was that time because there was a clock right above his television, which he was watching when he saw Askew in the kitchen. He said that Askew remained in

the kitchen for 20 to 25 minutes.

On cross-examination, Sanders was asked how he knew that the time was *9:15* p.m., and Sanders repeated that it was because his clock is on top of his television and he could see the kitchen while watching the television. He said that he knew that Askew was in the kitchen for 20 to 25 minutes but did not see him leave. He further said that it was not unusual for Askew to be in the kitchen. He recalled the police arriving later in the evening but did not recall the specific time of their arrival.

Defendant testified that he lived a short distance from Askew's boarding house and had been working for an automobile body repair shop in the area for the last eight years. He stated that he used the knife, which had been previously admitted into evidence, in connection with his job. On February 9, he went to the boarding house to visit Robert Sanders. Along the way, he met Koehler, whom he had previously seen in Askew's room at the boarding house, walking towards the same destination. Defendant observed that Koehler was carrying a bag and asked what was in it. Koehler answered that he had beer in the bag which he was going to drink. After they entered the boarding house together and walked into Askew's room, defendant asked Koehler for some beer and Koehler gave him some. After he consumed it, he asked Koehler for more and, after assuring Koehler that he would replace any beer he drank, Koehler told him he could help himself. Thereafter, Koehler placed his hand on defendant's hip and began "rubbing up" on his hip. Defendant initially pushed Koehler away but Koehler repeated this action. Defendant then shoved him against a dresser. Askew was not in the room while this was occurring.

According to the defendant, after he shoved Koehler into the dresser, Koehler began walking toward him with his hands in his pockets. Not knowing what Koehler was up to, defendant pulled his knife out of his pocket, grabbed Koehler by the collar and placed the knife up to his neck. When Koehler said that he had nothing in his pockets, defendant withdrew the knife and warned Koehler to keep his hands off him. When Askew returned, defendant told him that he should talk to his friend because he was "feeling" on him. Defendant then left the room and went to a neighbor's room, where he later was arrested. He specifically denied taking Koehler's beer or cigarettes by force, stating that Koehler had voluntarily given him the beer and that he had his own cigarettes.

On cross-examination, defendant denied telling Assistant State's Attorney Winninger that he never took the knife out of his pocket or

that he had struck Koehler with his fist. He also denied pushing Koehler's head into the wall, shoving his knife in Koehler's nostril or cutting the bridge of his nose.

After closing arguments, the trial judge found defendant guilty of the armed robbery, armed violence and aggravated battery, stating specifically that he believed the testimony of the State's witnesses but disbelieved the testimony of both defense witnesses. He further stated that he found the evidence of guilt to be overwhelming.

Before sentencing, defendant filed a motion for a new trial largely predicated on a claim of ineffectiveness of his privately retained counsel. In his motion, defendant raised counsel's failure to call two individuals, Reverend Charles Sullivan, who was defendant's uncle, and Jimmie Whittaker, defendant's mother, as witnesses at the trial. Sullivan was on the defense list of witnesses, and both Sullivan and Jimmie Whittaker were present in court on the day of trial. Sullivan's affidavit, which was attached to the motion, stated that he had informed defense counsel prior to trial that he had interviewed Koehler on the day after the incident at which time Koehler had told him that he had voluntarily given the beer and cigarettes to defendant and that he got scared and jumped out of the window after the defendant suddenly threatened to cut off his nose. Jimmie Whittaker's affidavit, also attached to the motion, stated that she had informed defense counsel prior to trial that she had interviewed Askew after the incident and he told her that he did not observe the altercation between her son and Koehler and that he did not know anything about defendant's use of a knife on Koehler. The State responded to the motion by arguing that defense counsel's decision to not call these witnesses was an exercise of trial strategy and therefore not a basis for a claim of ineffective assistance. The State also pointed out to the court that Sullivan's testimony would have been impeachable since Sullivan had told the State's investigator in an interview prior to trial that he knew nothing about the incident and that defendant was his friend.

After the trial judge heard these arguments, he denied the motion, again stating that he based his decision on his belief in Koehler's and Winninger's testimony and disbelief in Sanders' and defendant's testimony. He further stated that he did not view Askew's testimony as significant and even if Sullivan and Jimmie Whittaker were to testify in accordance with their affidavits, his judgment would not change.

OPINION

Defendant contends that his privately retained counsel failed to

perform in a reasonably effective manner. In support, he alleges his counsel's failure to (1) make an opening statement, (2) properly cross-examine Koehler, the complainant, concerning his uninvited advances towards defendant, and (3) call his uncle, Reverend Charles Sullivan, and his mother, Jimmie Whittaker, as witnesses on his behalf.

■ Under the standards enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, a claim of ineffective assistance of counsel will be sustained if counsel has failed to perform in a reasonably effective manner and there is a reasonable probability that, but for this substandard performance, the outcome of the proceeding would have been different. Illinois brought its standards for review of ineffective counsel claims in line with *Strickland* in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246, and has continuously adhered to these standards. (See, *e.g.*, *People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481; *People v. Consago* (1988), 170 Ill. App. 3d 982, 524 N.E.2d 989.) Under the *Strickland* standards, there is a strong presumption that counsel has performed in a professionally competent manner and the burden is on defendant to prove otherwise. (See *People v. Consago* (1988), 170 Ill. App. 3d 982, 988, 524 N.E.2d 989, 993.) Counsel's performance must not be evaluated in hindsight but rather must be viewed as of the time of his actual performance. (*People v. Spicer* (1987), 163 Ill. App. 3d 81, 93, 516 N.E.2d 491, 500.) His performance must be viewed in light of his total performance and not just on the basis of isolated acts. (*People v. Ayala* (1986), 142 Ill. App. 3d 93, 99-100, 491 N.E.2d 154, 158.) The ultimate goal in any evaluation of counsel's performance is to determine whether the performance has resulted in a breakdown in the adversarial process that our system relies upon for just results. See *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 882-83, 522 N.E.2d 1317, 1323.

Defendant claims that trial counsel's failure to make an opening statement constitutes ineffective assistance of counsel. He contends that his counsel gratuitously gave up a valuable opportunity to present the trial judge with a preview of his defense and suggests that the reason he did so was because he had no theory of defense to present.

■■ ■ Trial counsel's decision to forego an opening statement is not in and of itself evidence of ineffective assistance. (*People v. Georgev* (1967), 38 Ill. 2d 165, 169, 230 N.E.2d 851, 854.) The presumption is that a decision to forego an opening statement is no more than a tactical choice made by counsel to avoid making an advance disclosure of his trial strategy or his decision whether to call defend-

ant as a witness. That presumption has not been overcome in this case. Defendant argues that this decision indicates that counsel had no theory of the case, but that is not borne out by the record of counsel's representation in this case. The record does reveal the development of a defense theory that defendant was merely reacting to an unsolicited physical contact by Koehler and took only those steps necessary to prevent such contact. This theory is present in defense counsel's cross-examination of witnesses, the direct testimony of defendant himself and in counsel's closing argument.

As further proof that the trial counsel did not have a defense theory, defendant claims that he failed to properly cross-examine Koehler concerning the alleged uninvited physical contact he had with defendant. This simply is not supported by the record. Defendant's trial counsel conducted the following cross-examination of Koehler:

"Q. At any time, Mr. Koehler, did you put your hand on the defendant?

A. No.

Q. Did you make any motions toward the defendant at anytime, Mr. Koehler?

A. No.

Q. Are you smiling, sir?

A. No.

Q. Is that your normal continence [sic]?

A. Yes."

Thus, trial counsel did cross-examine Koehler regarding this alleged physical contact and, by doing so, set the stage for further elaboration on this point in the defense case in chief.

Finally, defendant claims that trial counsel's failure to call his uncle, Reverend Charles Sullivan, and mother, Jimmie Whittaker, as witnesses constituted ineffective representation. He contends that their testimony could have lent significant support to his denial that he attacked Koehler without provocation in the course of committing a robbery and would have diminished the credibility of Askew's corroboration of the attack. He characterizes counsel's failure to call these witnesses as an error of omission which cannot be explained in terms of trial strategy.

Defendant has the burden of overcoming the presumption that a decision to not call a witness is within the realm of trial strategy. (See *People v. Consago* (1988), 170 Ill. App. 3d 982, 988, 524 N.E.2d 989, 993.) Choices which are made on the basis of strategic considerations after a thorough investigation of all matters relevant to plausible options have traditionally been considered to be unchal-

lengeable. (*Strickland v. Washington* (1984), 466 U.S. 668, 690, 80 L. Ed. 2d 674, 695, 104 S. Ct. 2052, 2066.) A claim of incompetency arising from a matter of trial strategy will generally not support a claim of ineffective representation. *People v. Madej* (1985), 106 Ill. 2d 201, 214, 478 N.E.2d 392, 397.

■ Defendant has failed to overcome the presumption that trial counsel's decision to not call these witnesses was anything but a tactical choice made on the basis of strategic considerations. He fails to point to anything in the record to indicate other, unacceptable reasons for that decision. Significantly, the affidavits of both witnesses indicate that counsel had been informed of their testimony prior to trial. The fact that counsel knew what their testimony would be before he made his decision lends support to the inference that his decision to not call defendant's uncle or mother was simply a tactical one. (*People v. Flores* (1989), 128 Ill. 2d 66, 105, 538 N.E.2d 481, 497.) Such a decision, unlike one made after an inadequate investigation (see, *e.g.*, *People v. Solomon* (1987), 158 Ill. App. 3d 432, 511 N.E.2d 875), is presumed to be one made as a matter of trial strategy.

In *People v. Consago* (1988), 170 Ill. App. 3d 982, 524 N.E.2d 989, the reviewing court was presented with an argument similar to the one made in this case. There, defendant claimed that he received ineffective assistance of counsel because counsel failed to secure an eyewitness to a shooting to testify at trial. Prior to trial, the eyewitness had provided counsel with a sworn statement of his testimony and counsel had initially listed him as a potential witness. Despite the potential importance of this witness' testimony, the *Consago* court stated:

> "[E]ven if it were [important], the requirements as set forth in *Strickland* are extremely stringent and the defendant here must overcome the strong presumption of effective assistance of counsel and the general proposition that failure to secure testimony is generally regarded as a matter of trial strategy."

(*Consago*, 170 Ill. App. 3d at 988, 524 N.E.2d at 993.)

Noting that counsel knew of the witness' testimony prior to trial and had even listed him as a potential witness, the court found that defendant had failed to overcome the strong presumption of effective assistance and the proposition that counsel's decision was a matter of strategy.

Similarly, in the present case, Sullivan's and Jimmie Whittaker's affidavits indicate that counsel knew of their testimony prior to trial and even listed Sullivan as a potential witness. In light of these affidavits and the absence of any indication in the record to the contrary,

defendant has failed to overcome the *Strickland* presumption of effective assistance of counsel and the proposition that counsel's decision to not call these witnesses was a matter of trial strategy.

Defendant cites to *People v. Solomon* (1987), 158 Ill. App. 3d 432, 511 N.E.2d 875, and *Sullivan v. Fairman* (7th Cir. 1987), 819 F.2d 1382, as support for his argument that the failure to call these two witnesses constituted ineffective assistance of counsel. *Solomon* and *Sullivan*, however, involved inadequate investigation of potential witnesses. In the present case, there is no evidence of any failure to investigate. As the affidavits indicate, trial counsel was first made aware of the content of Sullivan's and Jimmie Whittaker's testimony and then decided to not call them as witnesses. Under the standards set forth in *Strickland*, a decision made under circumstances where the investigation is adequate is "virtually unchallengeable." *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Additionally, the witnesses not called in *Solomon* and *Sullivan* were occurrence witnesses unrelated to the defendants, whose testimony was deemed vital to the defense. In the present case, neither Sullivan nor Jimmie Whittaker was an occurrence witness, and their close familial relationship with defendant made their testimony naturally suspect and impeachable by the prosecution. Sullivan's testimony also was impeachable independently of his familial ties to defendant because of his previous assertion to the State's investigator that he knew nothing about the incident. Moreover, based on their affidavits, neither would testify to circumstances which would appreciably aid the defense theory. While Sullivan would have provided testimony that Koehler, the complainant, told him he voluntarily shared his beer and cigarettes with defendant, he also would have given potentially damaging testimony that Koehler told him that defendant threatened to cut off his nose. Though testimony that Koehler said that he voluntarily shared his beer would contradict his trial testimony that defendant took the beer by force, its connection to the defense theory was at best collateral. And, had Sullivan testified as contained in his affidavit that Koehler told him that defendant threatened to cut off his nose, he would have been providing testimony which would have severely undermined the theory that defendant's conduct was a "measured" response to Koehler's conduct. Jimmie Whittaker's testimony also would not have significantly aided the defense theory. According to her affidavit, she would have testified that Askew, a witness whose testimony was deemed insignificant by the trial judge, told her that he knew nothing about the incident. Her proposed testimony did not purport to offer any substantive evidence to support the defense theory.

Illinois courts have long adhered to the *Strickland* principle that trial strategy choices made after thorough investigation of matters relevant to plausible options are presumptively reasonable and virtually unchallengeable. Defendant concedes that Illinois courts have traditionally treated strategy decisions in such a manner but argues that the characterization of a decision as a strategy decision should not shield it from scrutiny on review. He urges us to follow the lead of California courts (see, *e.g.*, *People v. Ledesma* (1987), 43 Cal. 3d 171, 233 Cal. Rptr. 404, 729 P.2d 839) and engage in a "meaningful scrutiny" or an examination of the actual reasons for a counsel's strategy decision to determine whether it was soundly based. He cites to a recent Illinois Supreme Court case, *People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089, as support for the proposition that Illinois courts are now beginning to scrutinize the actual reasons for strategy decisions in cases involving a counsel's decision to not call witnesses.

The *Caballero* case involved a claim that trial counsel's failure to introduce mitigating testimony of several witnesses at a capital sentencing hearing constituted ineffective assistance of counsel. In support of the claim, defendant submitted affidavits showing that counsel had not contacted mitigating witnesses until after defendant's conviction, and then only briefly, and that he rejected several witnesses on the sole basis that they were not categorically opposed to the death penalty. In resolving the claim, our supreme court first recited the *Strickland* requirements and acknowledged the presumption of reasonableness extending to trial decision based on strategy, but stated that the presumption was negated by the information contained in the affidavits. The court then proceeded to probe the possible reasons for counsel's decision, including the claim in the affidavit that he rejected several witnesses because of their adverse position on the death penalty question. The court concluded that the claim that counsel decided not to call the witnesses because of their adverse position on the death penalty and the additional claim that he conducted an inadequate investigation required a remand for an evidentiary hearing to determine whether counsel's decision constituted ineffective assistance.

To the extent that *Caballero*'s holding purports to be predicated on counsel's apparent inadequate investigation, it is well within conventional standards for review of ineffective counsel claims. To the extent that the holding also purports to be predicated on the questionable soundness of counsel's tactical strategies, it would represent a departure from previously accepted guidelines. This incipient departure was critically acknowledged by Justice Ryan in a separate opin-

ion in *Caballero*. (*Caballero*, 126 Ill. 2d at 286, 533 N.E.2d at 1104 (Ryan, J., concurring in part, dissenting in part).) He noted that to be consistent with the *Strickland* requirements the court's inquiry should have stopped when it had determined that trial counsel had in fact interviewed the witnesses and then made his decision not to call them. When it examined the soundness of counsel's tactical strategies, it went beyond those requirements.

However, even under the view that *Caballero* signals a departure from the *Strickland* guidelines concerning the presumption validity and virtual unchallengeability of strategic choices, it would not change the result in this case. The record indicates ample basis for trial counsel's decision to not call either Sullivan or Jimmie Whittaker as witnesses. As previously noted, both had close familial ties with defendant, Sullivan's testimony was subject to impeachment on the basis of his prior inconsistent statement to the State's investigator, Sullivan's testimony contained matters which could have been deemed harmful to defendant, and neither Sullivan's nor Jimmie Whittaker's testimony appreciably aided the defense theory. Trial counsel reasonably could have concluded, on the basis of these various factors, that their testimony would have little or no value to the defense and could even negatively impact the presentation of the defense theory. Additionally, trial counsel reasonably could have concluded that Jimmie Whittaker's testimony would in many respects only be cumulative of testimony provided by Robert Sanders and thus of no significant value to the defense. In light of all of these reasons, we cannot say that counsel's decision to forego calling these witnesses was not a sound one.

An attorney must often choose among several alternative strategies in presenting a defense in a criminal proceeding. The fact that the one selected proves on hindsight to have been unsuccessful does not of itself denote incompetence. Having reviewed the totality of trial counsel's performance in this case, we find that he sufficiently subjected the State's case to the adversarial process so that defendant received, as required under *Strickland*, "a fair trial *** whose result is reliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

LORENZ and MURRAY, JJ., concur.