THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ISSAC JONES, Defendant-Appellant.

First District (1st Division)   No. 1—99—3858

Opinion filed June 18, 2001.

452

Michael J. Pelletier and Patricia Mysza, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Eileen M. O'Neill, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COHEN delivered the opinion of the court:

Defendant Issac Jones was indicted on two counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1998)), and one count each of attempt (first degree murder) (720 ILCS 5/8—4 (West 1998)), aggravated battery with a firearm (720 ILCS 5/12—4.2(a)(1) (West 1998)), aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 1998)) and aggravated battery (720 ILCS 5/12—4(b)(8) (West 1998)).[1] In November 1997, defendant was tried before a jury for the first degree murder of Maxine Parker and attempt (first degree murder) of Larry Thompson. The first trial resulted in a hung jury. Defendant waived his right to a jury for his second trial. The second trial, a bench trial, took place in May 1999. The court found defendant guilty of first degree murder, attempt (first degree murder) and aggravated battery with a firearm and sentenced him to consecutive prison terms of 26 years for first degree murder and 6 years for attempt (first degree murder). Defendant now appeals his convictions, asserting that he was denied the effective assistance of counsel predicated on counsel's failure to call an exculpatory witness at the bench trial. Defendant also claims that the trial court committed reversible error in imposing consecutive sentences predicated on the attempt (first degree murder) count. We modify defendant's sentence to run concurrently and otherwise affirm the judgment of the trial court.

The evidence introduced at defendant's second trial reveals that on July 18, 1994, Larry Thompson was driving his blue Chevrolet Cavalier to a grocery store with his girlfriend, Maxine Parker, and his sister, Nellie Thompson. Maxine was in the front passenger seat and Nellie was in the backseat. As Larry drove west on Madison, the traffic slowed and a gray Pontiac Trans Am pulled up behind him. The occupants of the Trans Am began yelling and cursing at Larry, telling him to get out of the way. Larry responded by yelling and cursing in return. This exchange lasted approximately two to four minutes.

Larry then proceeded down Madison toward Kedzie, making a right turn onto Kedzie. He pulled into the right lane to let the Trans

---

[1]The record is devoid of any reference to the entry of an order of *nolle prosequi* with respect to any of these charges on the part of the State.

Am pass. Instead of passing, the Trans Am pulled alongside Larry's car, firing five or six shots. As Larry ducked, one of the bullets grazed his right cheek. After the shooting subsided, Larry glanced over and saw that Maxine was slumped over and had blood coming from her left temple. Larry immediately drove to Cook County Hospital.

Detective Gail Maurovich of the Chicago police department was standing on the entrance ramp outside the emergency room of Cook County Hospital at the time Larry drove up. Detective Maurovich observed Larry getting out of the vehicle and running into the emergency room. She then looked into the vehicle and noted two women in the car; one in the backseat and another slumped over in the front passenger's seat with blood underneath her nose and mouth area. Maxine was admitted to the hospital in critical condition and died two days later of a gunshot wound to the left side of the head.

Detective Maurovich conducted a brief interview with Larry. She noticed that Larry had a "grazed-type" gunshot wound on his right cheekbone. Larry's injury did not require medical attention. During the interview, Larry provided Detective Maurovich with a description of the offenders and the gray Trans Am.

On July 22, 1994, Detective Thomas O'Grady and his partner, Detective Gene Harris, were assigned to investigate the homicide of Maxine Parker. During the course of his investigation, Detective O'Grady determined that John Thompson (no relation to Larry), also known as "Scoobie," was the owner of the gray Pontiac Trans Am involved in the homicide. After a conversation with "Scoobie,"[2] Detective O'Grady tried to locate a juvenile by the name of Ricky Brooks. It was later determined that Brooks was in police custody for an unrelated matter at the 11th District police station. Detective O'Grady interviewed Brooks with Brooks' mother present.

After speaking with Brooks, Detective O'Grady began looking for a man known as "Ike." It was later determined that "Ike" was in fact defendant Issac Jones. Detective O'Grady located defendant in the 2900 block of West Wilcox. Defendant was subsequently arrested at approximately 4:30 p.m. on July 22, 1994, and advised of his *Miranda* rights. Prior to transporting defendant to the Area 4 police station, Detective O'Grady attempted to locate Lamont Winters at Winters' home. This attempt was unsuccessful, however, and Detective O'Grady took defendant to Area 4.

Upon arriving at Area 4, Detective O'Grady placed defendant in an interview room. Defendant was once again advised of his *Miranda*

---

[2]The content of the interviews Detective O'Grady conducted with "Scoobie" and Brooks is not in the record.

rights. Defendant told Detective O'Grady that he was not present during the shooting, but had been in the car prior to that time with Brooks and a man by the name of Lamont Winters. After conducting the interview, Detective O'Grady wrote an arrest report and placed defendant in the 11th District holding cell.

On July 23, 1994, Larry was called in to view a lineup at Area Four. Larry viewed the lineup and identified defendant as one of the occupants of the Trans Am during the traffic altercation and subsequent shooting on July 18, 1994. At the conclusion of the lineup, defendant was once again placed in an interview room. After advising defendant of his *Miranda* rights, Detective O'Grady informed defendant that one of the surviving victims from the blue Cavalier had identified him as one of the occupants in the Trans Am when the shooting occurred. Based on this information, defendant agreed to give a statement. In this second statement, defendant admitted that he was in the gray Trans Am when the shooting occurred. He stated that he was in the front passenger's seat, Brooks was in the driver's seat and Winters was in the backseat. Defendant further stated that Brooks attempted to force his way into traffic, causing a male in a blue car to slam on his brakes. Brooks engaged in a verbal altercation with the driver of the blue car. Brooks then followed the blue car as it made a right turn onto Kedzie when Winters handed Brooks a gun. According to this second statement, it was Brooks who then took the gun and shot out of the passenger window at the blue car.

Defendant also gave a third statement, this time recorded, to Assistant State's Attorney David Gaughan. In this statement, defendant admitted that he had fired the gun. Defendant stated that Brooks passed him the gun after he followed the car onto Kedzie. Defendant further stated that he fired at the car approximately two to three times. Defendant read, corrected and signed the sworn statement.

At the first trial, the defense called Lamont Winters to the stand. Winters testified that he was currently incarcerated at the Joliet Correctional Center for possession of a controlled substance. Winters stated that at approximately 10:30 p.m. on July 18, 1994, he saw Brooks and defendant sitting in a car outside a restaurant. Brooks asked Winters if he wanted a ride and Winters responded "yes." Winters testified that Brooks was in the driver's seat, defendant was in the front passenger seat and he (Winters) sat in the backseat. Brooks then drove west on Madison when a blue car almost came in contact with the car driven by Brooks. Winters stated that Brooks and the driver of the blue car began arguing and cursing at one another. After this exchange, Brooks' car turned right onto Kedzie. Shortly thereafter, Winters heard three shots coming from the front seat of

the car and ducked his head. When Winters raised his head after the shooting ceased, he saw Brooks holding a gun in his right hand.

The testimony given by Winters at the first trial contradicts an earlier statement he provided the police approximately two years after the shooting. In this earlier statement, Winters told an assistant State's Attorney that Brooks pulled the gray Trans Am next to the blue car and that defendant started yelling at the driver of the blue car. Winters further stated that it was defendant who pulled a silver revolver hand gun from his lap and fired the gun three times out of the window of the car. This statement was recorded by the assistant State's Attorney and reviewed and signed by Winters. Winters did testify at the first trial on redirect, however, that the police had told him what to say in the earlier statement. Winters did not testify at the second trial.

Defendant testified on his own behalf at both the first and second trials. At both trials, defendant testified that he was on his way to the store when Brooks pulled up in a gray Trans Am. Brooks told defendant that his car had been stolen and that he wanted defendant to look at it to see whether it was "worth fixing." Brooks knew that defendant had helped his grandfather repair automobiles in the past.

After looking at the car, Brooks and defendant went to a restaurant where they encountered Winters. Defendant stated that after Winters joined them in the car they proceeded south down Albany to Madison. Brooks was in the driver's seat, defendant was in the front passenger seat and Winters was in the backseat. According to defendant, as Brooks attempted to turn onto Madison they nearly collided with a blue car. A verbal exchange took place between Brooks and the driver of the blue car. After the exchange took place, the blue car proceeded down Madison, taking a right turn onto Kedzie, and Brooks followed it. The blue car then pulled toward the curb and stopped. Defendant then testified that Brooks came alongside the blue car and began firing a gun at the car. Defendant further stated that he had to duck down because Brooks' arms were extended across the interior of the car toward the passenger side window.

## I. Ineffective Assistance of Counsel

Defendant first contends that he was denied the effective assistance of counsel at the second trial because of counsel's failure "to present Winters's testimony." Specifically, defendant complains of counsel's failure to call Lamont Winters to corroborate his own testimony that Ricky Brooks fired the gun at the blue car.

•1 We review claims of ineffectiveness of counsel under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L.

Ed. 2d 674, 104 S. Ct. 2052 (1984), which the Illinois Supreme Court recognized in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To determine whether there has been a violation of the defendant's sixth amendment right to effective assistance of counsel, the defendant must show: (1) that his counsel's "representation fell below an objective standard of reasonableness"; and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068; *People v. Shatner*, 174 Ill. 2d 133, 144 (1996); *People v. Consago*, 170 Ill. App. 3d 982, 987 (1988). The fundamental issue before us in a claim of ineffectiveness of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.

•2 To satisfy the first prong of the *Strickland* test, the defendant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in order to demonstrate that his counsel's performance was objectively deficient. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; *People v. Negron*, 297 Ill. App. 3d 519, 537 (1998). "Decisions concerning which witnesses to call at trial and what evidence to present are matters of trial strategy and cannot form the basis for a claim of ineffective assistance of counsel unless a strategy is so unsound that counsel can be said to have entirely failed to conduct any meaningful adversarial testing." *Negron*, 297 Ill. App. 3d at 538. "Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent." *Negron*, 297 Ill. App. 3d at 538.

It is the defendant's burden to overcome the presumption that counsel's decision not to call a witness was a matter of trial strategy. *People v. Whittaker*, 199 Ill. App. 3d 621, 628 (1990). Although Winters' testimony at the first trial was indeed exculpatory, Winters had given a prior inconsistent statement naming defendant as the shooter. This case is similar to the situation presented in *People v. Consago*, 170 Ill. App. 3d 982 (1988). In *Consago*, the court had to determine whether the defendant was denied effective assistance of counsel where his counsel failed to secure a witness for trial who gave a statement corroborating the defense theory that the shooting was an accident. *Consago*, 170 Ill. App. 3d at 987. The court found that the fact that defense counsel knew of the witness's testimony beforehand, coupled with the fact that certain portions of the witness's testimony were prejudicial to the defendant, allowed the court to infer that the failure to call the

witness was a "strategical maneuver." *Consago*, 170 Ill. App. 3d at 988. Additionally, the court found that the defendant failed to show that the outcome of his trial would have been different had the witness testified. *Consago*, 170 Ill. App. 3d at 988.

Similarly, an even stronger argument could be made in this case that because Winters actually testified in the first trial, counsel knew exactly what Winters' testimony at the second trial would be. Winters' testimony at the first trial did, in fact, corroborate the defense theory that Brooks shot at the blue car rather than defendant. However, Winters also made a recorded statement to police that defendant raised a silver revolver and shot at the blue car. Defendant concedes that this statement is clearly prejudicial to his case. This is especially true considering the fact that Winters' initial statement to police corroborates defendant's confession that he was the one who fired the gun. A trial counsel's apprehensions of what could occur when a witness is subject to the "full brunt of adversarial cross-examination" has been found to be a reasonable basis for not calling a witness to testify. See *People v. McKenzie*, 263 Ill. App. 3d 716, 722 (1994). Here, not only did trial counsel have knowledge of Winters' exact testimony on direct, he also had actual knowledge of the damaging effect of cross-examination on Winters' testimony.

Nevertheless, defendant argues that it was unreasonable for trial counsel not to call Winters at the second trial because: (1) Winters had a reasonable explanation for lying to the authorities in his written statement; (2) the written statement conflicted with the State's evidence; and (3) because the first trial resulted in a hung jury, it is reasonable to infer that Winters's testimony had a positive impact on the jury. None of these arguments demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. It is mere speculation to assume that the trial judge would have believed a convicted felon's "reasonable explanation" for lying to authorities. It is also speculation that the hung jury resulted from Winters' testimony alone. Moreover, the fact that Winters' written statement conflicts with the State's evidence that Larry did not see a gun in defendant's hands does little to demonstrate that a different outcome would have been reached.

Defendant cites to *Chambers v. Armontrout*, 907 F.2d 825 (8th Cir. 1990), and *People v. Davis*, 203 Ill. App. 3d 129 (1990), in support of his contention that trial counsel's failure to call Winters at the second trial constituted ineffective assistance of counsel. Both cases are distinguishable from the case at bar. In *Chambers* and *Davis*, the court found that defense counsel deprived the defendant of effective

assistance where he failed not only to call witnesses at trial but failed to *interview* witnesses who would have corroborated the defense theory. Unlike the defense counsel in both cases mentioned above, trial counsel here interviewed Winters when he approached counsel after giving the written statement incriminating defendant. During this interview, Winters told trial counsel that the statement that he made to the police was incorrect.

●3 It is well settled that strategic choices made by defense counsel after a thorough investigation of the law and facts relevant to the plausible options are "virtually unchallengeable." *Strickland*, 466 U.S. at 687-89, 80 L. Ed. 2d at 693-95, 104 S. Ct. at 2064-65. Defendant has failed to present any meaningful arguments to overcome the presumption that trial counsel's determination not to call Winters to the stand in the second trial was one of sound trial strategy. Trial counsel both interviewed Winters and heard his testimony at the first trial prior to making the determination not to call him as a witness at the second trial. Sound trial strategy "embraces the use of established rules of evidence and procedure to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts." *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996). Trial counsel could legitimately have decided, when given a second chance at the bench trial, that Winters' incriminating written statement and criminal status outweighed the exonerating testimony he gave at the first trial.

Clearly under the facts stated above, we cannot find that trial counsel's decision not to call such a witness "fell below an objective standard of reasonableness" under the first prong of the *Strickland* test. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. "[A] defendant's failure to establish either part of the Strickland test will defeat the claim," and therefore, we "need not 'address both components of the inquiry [where] the defendant makes an insufficient showing on one.' [Citation.]" *People v. Montgomery*, 192 Ill. 2d 642, 671 (2000). Accordingly, we find that trial counsel's representation did not constitute ineffective assistance of counsel.

## II. Consecutive Sentencing

Defendant argues, and the State concedes, that the trial court improperly sentenced him to 26 years for the first degree murder of Maxine Parker and 6 years for attempt (first degree murder) of Larry Thompson and ordered the sentences to run consecutively.

●4 Section 5—8—4(a) of the Illinois Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1998)) provides in part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during

which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury *** in which event the court shall enter sentences to run consecutively." 730 ILCS 5/5—8—4(a) (West 1998).

Prior to the Illinois Supreme Court's decision in *People v. Whitney*, 188 Ill. 2d 91 (1999), there was confusion over whether it was the Class X or the Class 1 felony that must involve the infliction of severe bodily injury in order to trigger the mandatory consecutive sentence provision under section 5—8—4(a). *Whitney*, 188 Ill. 2d at 96. Post-*Whitney*, however, it is clear that under section 5—8—4(a), consecutive sentencing is required "where the defendant has been convicted of either a Class X or Class 1 felony and where he had inflicted severe bodily injury during the commission of that felony." *Whitney*, 188 Ill. 2d at 98-99.

●5 At defendant's second trial, the trial judge made the following statement in support of her finding that defendant's sentences should run consecutively:

"With respect to the consecutive sentencing provisions set forth at 730 ILCS 5584a I am aware that there is discrepancy right now in the Appellate Court as to whether or not consecutive sentences would be appropriate. But for purposes of this sentence, the sentence I am about to impose, and relying on the 1998 First District opinion, People v. Biggs, 294 Ill. App. 3d 1046, I believe that the consecutive sentencing provisions do apply, that is because the Attempt First Degree murder and, for that matter, the Aggravated Battery with a Firearm are both Class X felony offenses and, certainly, with respect to First Degree Murder, severe bodily injury was imposed."

"A trial court's decision with regard to sentencing is to be given great deference, and a reviewing court should not substitute its judgment for that of the sentencing court absent an abuse of discretion." *People v. Durham*, 312 Ill. App. 3d 413, 420 (2000). In light of the supreme court's decision in *Whitney*, the trial judge's reliance on *Biggs*, a pre-*Whitney* case, to impose consecutive sentences was clearly an abuse of discretion. In her statement, the trial judge based the requirement of "severe bodily injury" on the first degree murder count. However, first degree murder is not a Class X or Class 1 felony. 730 ILCS 5/5—5—1(b) (West 1998); *Whitney*, 188 Ill. 2d at 100. Therefore, the determination to impose a consecutive sentence in this case cannot be based on the first degree murder count. The offense of attempt (murder), on the other hand, is a Class X felony and can be the basis for consecutive sentences in this case. 720 ILCS 5/8—4(c)(1) (West 1998).

Notwithstanding the above, prior to invoking a consecutive sentence in this case the requirement of "severe bodily injury" also must be met. Here, Larry Thompson testified that during the course of the shooting a bullet "grazed" his right cheek. Additionally, Officer Maurovich testified that she observed this "grazed-type" gunshot wound on Larry's right cheekbone. Larry did not receive any medical treatment for his injury. In fact, Larry testified that a "[d]octor gave [him] a band aid and said it was okay." "A 'nick or cut' requiring no medical attention is not a severe bodily injury." *Durham*, 312 Ill. App. 3d at 421. Therefore, the imposition of consecutive sentences was improper. Accordingly, defendant's sentences are hereby modified to run concurrently. We also grant the State's request for $100 in costs for defending this appeal and incorporate it as part of our judgment. 725 ILCS 5/110—7(h) (West 1998); 55 ILCS 5/4—2002.1 (West 1998). In all other respects, the judgment of the trial court is affirmed.

Affirmed as modified.

O'MARA FROSSARD and TULLY, JJ., concur.