NOTICE
Decision filed 01/18/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190254-U

NO. 5-19-0254

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Perry County. |
| | ) | |
| v. | ) | No. 17-CF-46 |
| | ) | |
| TRAYVON JOHNSON, | ) | Honorable |
| | ) | James W. Campanella, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justice Welch concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1    *Held*: Sufficient evidence supported the jury's determination that the victim correctly identified the defendant as the perpetrator. Rule 431(b) error was not subject to plain error review. Severe bodily injury for purposes of mandatory consecutive sentencing is something more than great bodily harm for purposes of the limited sentence credit available under the truth-in-sentencing law. The court's findings of both great bodily harm and severe bodily injury were supported by the evidence.

¶ 2    The defendant, Trayvon Johnson, was convicted of home invasion and armed robbery. The victim, Sherry Dunn, had known the defendant for many years when the incident leading to the charges took place in a dark room of her home during the early morning hours. The court found that the defendant's conduct caused both great bodily harm and severe bodily injury. Based on these findings, the court ordered the defendant's sentences to be served at 85% (see

1

730 ILCS 5/3-6-3(a)(2)(iii) (West 2016)), and the court ordered the sentences to be served consecutively, finding consecutive sentences to be mandatory (see *id.* § 5-8-4(d)(1)).

¶ 3    The defendant appeals both his convictions and sentences. He argues that (1) the evidence was insufficient to convict him because there was insufficient evidence to support a finding that Dunn correctly identified him as her assailant; (2) the court did not fully comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*; (3) the court's decision to mandate that the sentence be served at 85% based on a finding of great bodily harm was in error; and (4) the court's conclusion that mandatory consecutive sentences were warranted due to a finding of severe bodily injury was likewise in error. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5    The State charged the defendant with one count of attempted murder, two counts of home invasion, and one count of armed robbery. The original information also included charges of residential burglary, unlawful use or possession of a weapon by a felon, and aggravated battery; however, these three charges were dropped before trial. The charges stemmed from an incident that took place during the early morning hours of March 25, 2017. The victim, Sherry Dunn, was 70 years old at that time.

¶ 6    The matter came to trial in December 2018. Dunn testified that she had known the defendant for at least 12 years before the incident. She explained that he had been involved in a relationship with her late granddaughter, Lacy Dunn, and that he was the father of her great-grandson, Josh. The defendant and his wife, Amy Johnson, had custody of Josh, and they allowed Dunn to see him as often as she wanted. Asked whether she saw the defendant on a regular basis, Dunn replied, "Well, yes and no." She was not asked to elaborate.

¶ 7    Dunn testified that on the day before the incident, the defendant and his wife, Amy, came to her house in DuQuoin, Illinois. The three of them went to Carbondale to shop for a birthday present for one of Dunn's other grandchildren. They first stopped at Dunn's bank, where she withdrew $200 in cash. Next, they stopped at Taco Bell, where Dunn bought lunch. Finally, they stopped at Walmart to buy the present. Dunn noted that she gave the defendant $20 to go inside and make the purchase while she and Amy waited in the car.

¶ 8    Dunn next testified about the incident itself. She stated that she awoke early in the morning to what sounded like glass breaking in another room. She explained that it was "getting daylight" outside, so there was light near the window even though no lights were on inside the house. Dunn testified that the defendant came "storming into the bedroom" wearing a dark-colored hoodie, which Dunn assumed was black. The hood was up, but was not obscuring the defendant's face. When asked if she had any doubt that the individual who entered her bedroom was the defendant, she replied, "No doubt whatsoever."

¶ 9    Dunn testified that the defendant jumped on top of her and began choking her. At this point, she was still in bed. According to Dunn, the defendant said, "You got a million dollars and I am going to have some of it." He then threw her out of her bed. That's when she saw that he was holding a knife, the handle of which appeared to be wrapped in something. She explained that she could see this because the window blinds were open, and it was "starting to get daylight" outside. The window was behind the defendant. Dunn testified that the defendant then stabbed her "five times, once really bad." He then choked her until she passed out.

¶ 10   Dunn stated that at some point during the attack, the defendant said, "I am going to kill you, you fucking bitch." At another point, she warned him that he was going to get into trouble, but the defendant did not respond.

3

¶ 11    Dunn further testified, "when I came to, my billfold was all dumped all over the floor." The remainder of the cash she had withdrawn the previous day, $140, was missing. She then "stumbled down the hallway," found her phone, and called the police.

¶ 12    A recording of Dunn's call to police was admitted into evidence and played for the jury. The recording begins with Dunn stating, "This is Sherry Dunn, 224 East Parker. I have been attacked." After confirming Dunn's address, police dispatcher Kimberly Morgan asked, "And who attacked you?" Dunn replied, "It was Trayvon Johnson." Morgan asked Dunn whether Trayvon Johnson was still in the house, and Dunn told her he was no longer there. Morgan then asked, "Do you need an ambulance?" Dunn replied, "No, I don't think, but I have a lot of blood everywhere." She went on to explain, "He pulled a knife on me and my throat." When asked whether the attack had occurred "just now," Dunn said, "Yeah." Morgan told her, "Okay. I will get an ambulance over there." When Dunn reiterated that she did not think she needed an ambulance, Morgan said, "I'm sorry. I meant an officer."

¶ 13    Dunn identified her voice on the recording. She also identified the defendant in court.

¶ 14    Dunn was asked about the security cameras she had in her home. She stated that one of the cameras was located in her kitchen. That camera pointed directly toward the entry door on which the glass had been broken. Dunn noted that the cameras sent pictures to her cell phone. However, she stated that all she got were black pictures.

¶ 15    On cross-examination, defense counsel indicated that he wanted to ask Dunn about the lighting conditions when the glass was broken. Dunn stated, "That was in the back door and it was dark in there and he came down the hallway." Counsel went on to question Dunn about the lighting conditions in her bedroom during the attack. Dunn acknowledged that she told police that it was too dark for her to see whether the defendant's hoodie had any writing on it. She did

4

not remember whether she told any of the investigating officers that there was light coming through the window.

¶ 16 Defense counsel next asked Dunn about her ability to describe her attacker to the police. Before questioning her, a portion of a recording of the interview she gave police was played. In it, a detective asked, "Do you know if Trayvon has any facial hair right now?" Dunn replied, "I don't think he does unless just overnight growth, you know." Counsel asked Dunn if, when she gave the interview, she understood this question as asking whether the attacker had facial hair. Dunn replied, "Correct."

¶ 17 Dunn acknowledged that she told detectives she was thrown against her dresser during the attack. She testified, however, that she did not think this occurred, although she noted that it was possible if it happened while she was being thrown out of her bed.

¶ 18 Dunn testified that she was on the floor when the defendant cut her with the knife. She stated that although the defendant choked her both while she was in the bed and when she was on the floor, the only place he used the knife was on the floor. Dunn stated that the only person she saw inside her home during the attack was the defendant. She noted that she "heard that there was a girl in the yard," but she did not know whether this was true.

¶ 19 When asked about the attacker's response to her statement that he would get in trouble, Dunn acknowledged that he responded by saying, "Why are you calling me Trayvon? I'm not Trayvon." She testified that he spoke in a deeper voice than usual.

¶ 20 Dunn acknowledged that the defendant was aware that she did not have millions of dollars, as the assailant claimed during the attack. She further acknowledged that the defendant had always been kind to her in the many years she had known him, but she stated, "I mean, he

5

can be a stinker, but nothing this bad." She testified, "I just couldn't believe that a nice guy would do this."

¶ 21    In response to further questions, Dunn testified that she wore bifocals, and she acknowledged that she was not wearing them during the attack. She also acknowledged that she had previously been prescribed medications to treat migraines and back pain, and that one of the side effects was confusion. She testified, however, that she did not regularly use these medications. Dunn likewise acknowledged that memory loss was a potential side effect of one of the pain medications prescribed for her after the attack.

¶ 22    On redirect examination, Dunn testified that the defendant was high during the attack. When asked whether she recognized the defendant's voice, she replied, "Yes. He tried to change it, but I knew it was him. Even though I was half asleep, I still knew it was him."

¶ 23    The defendant's wife, Amy Johnson, testified for the State. She stated that she and the defendant went shopping with Dunn on the afternoon of March 24, 2017, because Dunn "wanted a little bit of help." Amy noted that their home was within walking distance of Dunn's. She then testified as follows concerning the events of the morning of March 25: The defendant "had been in and out" of the house that night. He returned home at around 6 in the morning with Chastity Ross. The defendant woke Amy at that time and asked to use her cell phone to place a call because his battery had died. According to Amy, the defendant went outside to make the call. When he returned the phone to her, she looked to see who he had called, but there was no record of the call in the call log. Amy explained that there would have been a record unless the defendant had deleted it. A few minutes later, the defendant left the house with Ross, stating that they were going to Walmart.

¶ 24　On cross-examination, Amy was asked whether the defendant had facial hair. She explained that his usual look included a mustache and "a little goatee, scruffy, whatever you want to call it." She stated that he was occasionally clean-shaven, but not very often. Asked if he was clean-shaven on the day Sherry Dunn was attacked, Amy replied, "I don't believe so."

¶ 25　Phillip Lee testified that he worked overnight driving a cab on the date in question. He received a call from Chastity Ross shortly after 7 a.m. on March 25, 2017. Lee explained that he knew Ross because she was a repeat customer. On this occasion, she asked to be picked up on Washington Street south of Parker in DuQuoin. Lee testified, however, that when he arrived at that location, he did not see her. When he called her, she gave him an address on North Walnut, which was three blocks away. Lee picked Ross up at the address she provided. He testified that she got into the cab alone and asked him to wait a minute. Then the defendant came out of the building and got into the cab. Lee was able to identify the defendant in court.

¶ 26　On cross-examination, Lee testified that he did not see any blood on the defendant when he entered the cab. He was shown photographs of the defendant and Chastity Ross taken by a store security camera shortly after the attack. He was able to identify both the defendant and Ross in the photos, and he noted that in one of the photos, the defendant appeared to have a mustache.

¶ 27　Bill Asbury testified for the State that he lives one block from Sherry Dunn's house. On the morning of March 25, 2017, he drove to a nearby McDonald's restaurant to pick up breakfast. At approximately 6:30 or 7 a.m., he drove past Sherry Dunn's house and saw an African-American man he did not recognize walking away from Dunn's house. Asbury explained that when he first saw the man, he was driving back to his own home to get a list of things to order from McDonald's because he had forgotten to bring the list with him. He drove

7

past Dunn's house again on the way back to McDonald's after picking up the list. He saw the same man talking to a white woman nearby. Although Asbury testified that he recognized the woman, he stated that he was not certain that she was the person he thought she was.

¶ 28 Asbury further testified that he saw police cars in front of Dunn's house when he again drove past the house later in the day. He stopped and told the officers what he had seen earlier. On cross-examination, Asbury noted that police never contacted him to ask him any questions about what he had seen or to ask him to look at a photo array. He testified that he did not see either the black man or the white woman enter or exit Dunn's residence.

¶ 29 Officer Rustin Juhl responded to the scene. He spoke to Dunn only briefly. He explained at trial that he called an ambulance for her "because of the severity of the wound and [because] she was still bleeding." Juhl testified that Dunn had blood on her and appeared to be shaken up.

¶ 30 Juhl described the crime scene. He observed shards of broken glass, both on the step outside the kitchen door and on the kitchen floor. He also observed droplets of blood on the floor "leading into the kitchen." Juhl testified that Dunn's bedroom was "in disarray." He explained that there were shards of broken glass on the floor, believed to be from a broken lamp, and red stains on the bed linen, believed to be blood. Although Juhl did not recall seeing bloodstains on the bedroom carpet, he pointed out that in one of the photos he took, a stain resembling blood was visible on the carpet. In addition, Juhl observed shards of glass and a red stain believed to be blood in the bathroom sink. He did not find any blood on Dunn's phone.

¶ 31 Dr. Jon Riley Hays, the physician who treated Dunn at the emergency room that morning, testified concerning her injuries. He stated that she had lacerations on both thumbs, the right side of her chest, and her left arm, and "a large ecchymotic swelling, which means a bruise, a type of severe bruise," on the back of her head. Dr. Hays testified that Dunn was traumatized by her

8

experience. He noted that she repeated her story multiple times and could not remember questions she had been asked just minutes earlier.

¶ 32   According to Dr. Hays, Dunn was most concerned about the lacerations; however, he was more concerned about "the large bump on the back of her head." He ordered CT scans of Dunn's head and neck. Although the scans indicated that there were no hemorrhages or masses, they did reveal a "very large cephalgia" to the back of her head. He explained that this meant there was bleeding "between the skull and the full thickness of the skin."

¶ 33   Asked about the depth of Dunn's lacerations, Dr. Hays noted that they were not deep enough for him to have found foreign bodies or particulate matter in the wounds. He explained that he examined her wounds for particulate matter because its presence is a common concern after altercations involving injuries. When asked if Dunn's injuries required stiches, Dr. Hays replied, "I think that we were able to Steri-Strip most of her wounds." He explained that using Steri-Strip is preferable to sutures when possible because "[y]ou cause more trauma by suturing those things and the hurt to get numbed up and *** if the body can heal it on its own, we let the body do the work." On cross-examination, he was asked if Dunn's lacerations "were superficial." He responded, "Yes."

¶ 34   Finally, Dr. Hays testified concerning the pain experienced by Dunn as a result of the attack. He stated that she reported feeling pain "in several areas of her chest." He testified that he prescribed her a limited amount "of low to medium powered pain medication." Dr. Hays noted that he was "notoriously very stingy" in prescribing pain medications. He continued, "And so if I prescribed her those, my index of suspicion that she was hurt, genuinely pretty hurt, was high."

¶ 35   The State also offered into evidence photographs of the crime scene and of Dunn's injuries. Although we need not discuss these photographs in depth, it is worth noting that the

photographs of Dunn's bed show a substantial number of what appear to be bloodstains. It is also worth noting that one of the photographs depicts two injuries not described by Dr. Hays in his testimony—a small bruise and an additional laceration on her back. We note, parenthetically, that the same photograph also shows a scar from a back surgery Dunn underwent at some point. There is no dispute that the scar is unrelated to the incident at issue. Finally, the State presented evidence that the call log from Dunn's phone showed a 13-second incoming call from the defendant at 5:49 a.m. on March 25, 2017, although Dunn testified that she did not remember answering that call.

¶ 36    The defense presented evidence that the investigating officers failed to use caution tape or evidence markers to adequately secure the crime scene. They also presented evidence that the investigating officers did not dust for fingerprints or attempt to collect touch DNA samples from the kitchen door handles and did not collect swabs from most of the suspected bloodstains to submit for testing.

¶ 37    The defense also presented evidence concerning prior statements made by Dunn. Detective Phillip Schimanski testified that he and another detective interviewed Dunn at the hospital on the morning of the incident. He stated that she told the detectives that her attacker threw her against the dresser. He further testified that at no point during the interview did they discuss whether sunlight was coming through the window. Alan Profancik, a legal investigator for defense counsel, testified that when he interviewed Dunn at her home in June 2018, she told him that her assailant only choked her when she was still in her bed.

¶ 38    The jury found the defendant guilty on both charges of home invasion and the charge of armed robbery. However, the jury was deadlocked on the charge of attempted murder. The State dismissed that charge, and the parties agreed to accept the verdicts on the remaining charges.

10

¶ 39    The court held a sentencing hearing on March 8, 2019. After considering amendments to the presentence investigation report (PSI), the court announced that it must address the issues of merger, extended-term sentencing eligibility, consecutive sentences, and the applicability of the truth-in-sentencing law. The prosecutor indicated that the State did not intend to seek an extended term sentence, and the court and counsel for both parties agreed that the two counts of home invasion should merge. The court therefore noted that one count of home invasion would be vacated.

¶ 40    The court then turned its attention to the question of consecutive sentencing. The court stated that because both of the remaining charges were Class X felonies, consecutive sentences were mandatory. The court reasoned that under the applicable statute, section 5-8-4(d)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(1) (West 2016)), the requirement of "severe bodily injury refers to the Class 1" felony, "but if it's a Class X, it has to be a triggering offense. It has to be consecutive."[1] Defense counsel argued that the requirement of severe bodily injury applies "across the board" to either Class X or Class 1 felonies. Although the State had argued in its sentencing memo that consecutive sentences were mandatory because the defendant had inflicted severe bodily injury, the prosecutor did not present any argument on this question at the hearing. The court rejected defense counsel's argument and ruled that consecutive sentences were mandatory based solely on the defendant's conviction of two Class X felonies.

¶ 41    Next, the court considered whether the defendant would be required to serve 85% of his sentence under the truth-in-sentencing law. The State argued that this requirement was applicable

---

[1]The statute provides that consecutive sentences are mandatory when "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury." 730 ILCS 5/5-8-4(d)(1) (West 2016). The Illinois Supreme Court has interpreted this provision as requiring consecutive sentences only if a defendant inflicted severe bodily injury during the commission of *either* a Class X or Class 1 felony. *People v. Whitney*, 188 Ill. 2d 91, 98-99 (1999).

11

because the testimony of Dr. Hays and Sherry Dunn demonstrated that Dunn suffered great bodily harm. Defense counsel pointed out that Dunn refused medical treatment, noting that she only went to the hospital because she was asked to do so by the responding officer. Counsel acknowledged that Dunn's refusal to seek medical treatment was not dispositive, but argued that it "reflects *** how she is perceiving the seriousness of her injury." In response, the prosecutor emphasized that Dr. Hays described Dunn as being traumatized and that she had a large subdural hematoma from a blow to her head and experienced significant pain. The prosecutor further remarked, "I think in addition to the injuries ***, we need to be cognizant that Miss Dunn *** was a 70-year-old woman who was choked until she was rendered unconscious." The court stated that "when you choke somebody 70 years old out and they are stabbed, slashed, or cut 5 or 6 times, irrespective of what kind of treatment they got ***, it's great bodily harm."

¶ 42 The court then heard arguments from the parties concerning factors in aggravation and mitigation. The court imposed consecutive sentences of 15 years, to be served at 85%.

¶ 43 The defendant filed a motion to reconsider sentence, arguing, among other things, that the court erred in holding that consecutive sentences were mandatory based solely on his convictions on two Class X felonies. On May 24, 2019, the court held a hearing on the motion. At the outset, the court acknowledged that it erred in holding that a Class X felony triggers the requirement of consecutive sentences even without a finding of severe bodily injury. The court also stated that "great bodily harm by caselaw is something less than severe bodily injury." The parties then presented arguments on the question.

¶ 44 In arguing that Dunn's injuries did not constitute severe bodily injury, the defense emphasized that no stitches were required for the knife wounds. The State reminded the court of Dunn's other injuries—the loss of consciousness due to being choked and her head injury. The

court noted that it was considering the injuries inflicted on Dunn with the knife "and also with the tossing around of her." However, in describing her injuries, the court focused on the knife wounds, emphasizing that these injuries included slashes, cuts, and "slices to her body." The court expressly found that these injuries constituted severe bodily injury. Therefore, it denied the defendant's motion. This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46                              A. Sufficiency of the Evidence

¶ 47    The defendant first argues that the evidence was insufficient to support his conviction beyond a reasonable doubt. Specifically, he contends that there was not enough evidence to support a finding that Dunn correctly identified him as the perpetrator. We disagree.

¶ 48    The question before this court in an appeal challenging the sufficiency of the evidence is whether the evidence was sufficient for any reasonable trier of fact to find the essential elements of the offense beyond a reasonable doubt. In making this determination, we must view the evidence presented at trial in the light most favorable to the prosecution. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We must also draw all reasonable inferences from the evidence in favor of the prosecution. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 49    In addition to proving each element of the offense, the State must prove beyond a reasonable doubt that the defendant was the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). A single witness's identification of the defendant as the perpetrator is sufficient to support a conviction if the witness had the opportunity to view the defendant under circumstances that permitted a positive identification. *Id*. This is true even if there is conflicting testimony from other witnesses. *Id*. It is the role of the jury, not this court, to resolve conflicts in the evidence and determine the credibility of the witnesses. *Collins*, 106 Ill. 2d at

13

261-62. Because the jury had the opportunity to see and hear the witnesses as they testified, jurors were in a better position to assess witness credibility than we are. *Wheeler*, 226 Ill. 2d at 114-15. Thus, their credibility determinations are entitled to great deference. *Id.* at 115. We will reverse only if the evidence is so improbable, unreasonable, or unsatisfactory that it raises a reasonable doubt as to the defendant's guilt. *Id.*; *Collins*, 106 Ill. 2d at 261.

¶ 50    In assessing the reliability of a witness's identification testimony, Illinois courts generally consider the "*Biggers* factors." *Slim*, 127 Ill. 2d at 307. Those factors, set forth by the United States Supreme Court in *Neil v. Biggers*, include (1) the witness's opportunity to view the perpetrator at the time of the offense, (2) the degree of attention paid by the witness, (3) the accuracy of any prior descriptions given by the witness, (4) the witness's level of certainty at the confrontation at which the identification is made, and (5) the time that elapsed between the offense and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). The Supreme Court held that "the central question" is "whether under the 'totality of the circumstances' the identification was reliable." *Id.* at 199.

¶ 51    The defendant argues that three of the five *Biggers* factors weigh in favor of a finding that Dunn's identification of the defendant was not reliable. He further contends that without corroboration, Dunn's testimony identifying him as her assailant was not sufficient to support his conviction beyond a reasonable doubt. We disagree.

¶ 52    The defendant argues that the first *Biggers* factor—the witness's opportunity to observe the perpetrator—is the most important of the five factors because a witness cannot accurately identify a suspect that she did not have an adequate opportunity to observe. See, *e.g.*, *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000) (reversing a defendant's conviction in part because "the lone eyewitness saw only the back of the shooter's head until he momentarily

14

glimpsed the shooter's profile from 90 feet away"). The defendant further contends that Dunn's opportunity to view the perpetrator in this case was limited by two factors—she was not wearing the glasses she needed to see clearly, and it was dark in the room. The defendant acknowledges that Dunn testified that there was light coming through the window, but he emphasizes that she did not mention this to police when she was interviewed shortly after the incident. We find these arguments unavailing.

¶ 53    We first reject the defendant's suggestion that courts must give more weight to some *Biggers* factors than to others. *Hernandez*, the case cited by the defendant for this proposition, did not include any holding or statement indicating that the opportunity to observe the perpetrator is the most important of the *Biggers* factors. Moreover, as we have already explained, the Supreme Court held that the crucial question is the reliability of the witness's identification under the totality of the circumstances. *Biggers*, 409 U.S. at 199.

¶ 54    We next note that although Dunn did not mention the fact that light was coming in through the window to police, she never made any statements that contradicted her trial testimony on this point. Nevertheless, Dunn testified that it was just beginning to grow light outside. From this testimony, it is clear that while there was some light in the room, it was still fairly dark. Although we agree with the defendant that this darkness coupled with Dunn's limited vision likely impeded her ability to see the defendant to some degree, other evidence supports a finding that she had an adequate opportunity to observe him. Although it is not clear precisely how long the attack lasted, it was more than a few moments. Dunn testified that she was face to face with her assailant. Moreover, the assailant spoke to Dunn, which gave her the opportunity to recognize his voice.

15

¶ 55 Turning our attention to the second *Biggers* factor, the defendant argues that the degree of attention paid by Dunn during the attack likewise undermines the reliability of her identification of the defendant. He points to Dunn's testimony that she was "half asleep" when the defendant spoke to her during the attack and her testimony that she was "panicked" and "traumatized" while the crime was occurring. The defendant also points to the evidence that Dunn had prescription medications on hand that "may have" contributed to her sleepiness. Finally, he emphasizes evidence that Dunn experienced confusion after the attack. We note, however, that there was no evidence that her attention was focused on anything other than the defendant during the attack. The extent to which her admitted panic and/or sleepiness may have inhibited her ability to focus on the appearance of her assailant was a question of fact for the jury to resolve.

¶ 56 Next, we consider the third *Biggers* factor—the accuracy of Dunn's prior descriptions of the defendant. In arguing that Dunn gave inaccurate descriptions of him, the defendant highlights two aspects of her descriptions that he considers to be inaccurate. First, he asserts that Dunn's testimony that he did not have any facial hair was contradicted by the testimony of both Phillip Lee and Amy Johnson. Second, he asserts that although Lee "testified that the defendant was wearing unusually reflective shoes on the day of the attack, *** Dunn never mentioned them." We are not persuaded.

¶ 57 We first note that the defendant's argument mischaracterizes Lee's testimony about the defendant's shoes. As discussed previously, Lee was asked by defense counsel to look at photos taken of the defendant and Chastity Ross shortly after the incident. In reference to one of those photos, defense counsel asked, "Do you notice anything in particular about his shoes?" In response, Lee stated that the photograph was "a little blurry" but it looked to him like the

16

defendant was wearing tennis shoes. Counsel then asked, "It has a reflector; is that correct?" In response, Lee testified, "Reflector or sock maybe."

¶ 58    More importantly, however, similar "discrepancies and omissions as to facial and other physical characteristics are not fatal, but simply affect the weight to be given [to] the identification testimony." *Slim*, 127 Ill. 2d at 308. This is partly because such discrepancies involve questions of credibility, which are up to the jury to resolve. *Id*. It is also because " 'it is contrary to human experience to make an identification by noticing first the separate features *** and then, somehow, running off a total to determine recognition or non-recognition.' " *Id*. at 309 (quoting *People v. Ervine*, 64 Ill. App. 2d 82, 87 (1965)). Illinois courts have specifically held that "failure to notice facial hair is not fatal to a positive and otherwise credible identification." *Id.* at 310 (citing *People v. Catlett*, 48 Ill. 2d 56, 63 (1971); *People v. Taylor*, 143 Ill. App. 3d 252, 255 (1986); *People v. Brown*, 50 Ill. App. 3d 348, 354 (1977); and *People v. Calhoun*, 132 Ill. App. 2d 665, 668 (1971)). The same is true of a witness's inability to accurately describe the perpetrator's clothing. *Id.* (citing *People v. Harrison*, 57 Ill. App. 3d 9, 14-15 (1978), and *People v. Marbley*, 34 Ill. App. 3d 434, 439 (1975)).

¶ 59    The defendant acknowledges that the remaining two *Biggers* factors—the witness's degree of certainty and the amount of time between the offense and the confrontation—both weigh in favor of finding Dunn's identification reliable. As the defendant acknowledges, Dunn stated that she was certain the defendant was her assailant and never expressed any doubt on this question. As he also acknowledges, Dunn identified him as the perpetrator "almost immediately" after the attack when she spoke to the police dispatcher.

¶ 60    We must emphasize that, as we stated earlier, the question before us is whether, considering the totality of the relevant circumstances, the witness's identification of the

17

defendant was reliable. *Biggers*, 409 U.S. at 199. Pertinent circumstances in this case include the fact that Dunn had known the defendant for more than a decade and was able to recognize his voice. Also relevant is the fact that Dunn's identification of the defendant as the perpetrator was corroborated by circumstantial evidence. The testimony of Amy Johnson placed the defendant near the scene of the crime shortly before it occurred, and the testimony of Phillip Lee placed him near the scene shortly after the crime occurred. Lee's testimony, in turn, was supported by Amy's testimony that the defendant was with Chastity Ross at the relevant time. In addition, the testimony of both Dunn and Amy supports an inference that the defendant was aware that Dunn had a large amount of cash on hand, thus providing him with a motive. Not coincidentally, that cash was the only thing stolen. In view of these circumstances as well as the deference due the jury's determination, we conclude the evidence was sufficient to prove beyond a reasonable doubt that Dunn correctly identified the defendant as the perpetrator.

¶ 61                                B. Rule 431(b) Error

¶ 62     The defendant next argues that the court failed to fully comply with Rule 431(b). He acknowledges that counsel forfeited this argument by failing to object during *voir dire*. See *People v. Belknap*, 2014 IL 117094, ¶ 47. He urges us to consider his claim under the plain error doctrine, however, arguing that the evidence was closely balanced. We decline to do so.

¶ 63     Rule 431(b) requires the trial court to explain four important principles of criminal law to prospective jurors during *voir dire*. The rule further requires the court to ask all prospective jurors whether they both understand and accept each of the principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). *Id*. Rule 431(b) does not mandate any particular method of inquiry. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 26. However, it does require the court to provide all

18

prospective jurors with an opportunity to indicate to the court whether they both understand and accept each principle. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 64     The defendant points to two alleged flaws in the court's questioning of jurors. First, he complains that the court questioned the jurors on each of the Rule 431(b) principles "collectively on a row-by-row basis without affording an opportunity for individual jurors to respond." Second, he contends that the court failed to ask each row of prospective jurors whether they both understood and accepted each principle. We note that questioning jurors individually is not required. See *People v. Birge*, 2021 IL 125644, ¶ 34. However, the State concedes that the court erred by not asking all groups of jurors whether they both understood and accepted each of the principles, and we agree. Some rows were asked if they understood the principles, while others were asked whether they accepted or could apply the principles. Thus, not all jurors were given the opportunity to tell the court whether they both understood and accepted each principle as required. We must therefore consider whether plain error review is warranted.

¶ 65     The plain error doctrine allows an appeals court to consider arguments that have been forfeited if (1) the evidence was so closely balanced that the asserted error alone threatened to tip the scales of justice against the defendant or (2) the claim involves an error so fundamental that it undermined the fairness of the defendant's trial and threatened the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Only the first prong of the plain error rule is at issue here. The defendant does not argue that second-prong plain error review would be appropriate, and we note that our supreme court has held that plain error review of Rule 431(b) errors is not available under the second prong absent evidence that the asserted error resulted in a biased jury. *People v. Sebby*, 2017 IL 119445, ¶ 52. We must therefore consider whether the evidence was closely balanced.

¶ 66 Here, the evidence was overwhelming that the offense occurred. Undisputed evidence showed that the window to Dunn's kitchen door was shattered, that she sustained a serious bruise to the back of her head and multiple knife wounds, and that $140 was stolen from her billfold. As we discussed earlier, however, the defendant has raised questions concerning Dunn's ability to accurately identify him as the perpetrator. We recognize that the question of whether the evidence is sufficient to support a conviction beyond a reasonable doubt is different from the question of whether the evidence is closely balanced. See *Piatkowski*, 225 Ill. 2d at 566. However, we believe that the identification testimony in this case was strong enough that the Rule 431(b) error was not likely to tip the scales of justice against the defendant. Although there were some discrepancies in Dunn's testimony and areas that lacked clarity, they related to details such as the order in which the events occurred and whether she was on the bed or the floor when she was choked and cut with the knife. The fact that she referred to the defendant's action as "stabbing" her, rather describing his action with the more precise term "cutting," does not undermine her credibility. She did not claim to have deeper wounds than she did. For these reasons, we decline to find that plain error review is warranted.

¶ 67 C. Great Bodily Harm and Truth in Sentencing

¶ 68 The defendant next argues that the court erred in finding that Dunn's injuries constituted "great bodily harm" for purposes of the truth-in-sentencing provisions. We reject his contention.

¶ 69 The "truth-in-sentencing" law refers to a change in the method used to calculate eligibility for good-conduct credit. *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11. Ordinarily, prisoners are entitled to earn day-for-day credit for good conduct. *Id.* (citing 730 ILCS 5/3-6-3(a)(2.1) (West 2006)). However, under the truth-in-sentencing law, a defendant convicted of certain enumerated offenses—including home invasion and armed robbery—is

20

entitled to earn a maximum of 4.5 days of good-conduct credit per month served if the court finds that his criminal conduct caused great bodily harm. 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016). In such cases, "the defendant must serve at least 85% of his or her sentence." *People v. Salley*, 373 Ill. App. 3d 106, 109 (2007).

¶ 70    The term " 'great bodily harm is not susceptible [to] a precise legal definition.' " *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 13 (quoting *People v. Mimes*, 2011 IL App (1st) 082747, ¶ 29). However, it requires something more serious than "bodily harm" as that term is used in the context of ordinary battery. *Id.* "Bodily harm" in that context requires only "some sort of physical pain or damage to the body, like lacerations, bruises, or abrasions." *People v. Mays*, 91 Ill. 2d 251, 256 (1982). While a finding of great bodily harm does not require hospitalization or permanent injury, it does require something more than bodily harm. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 13.

¶ 71    Whether a crime victim's injuries constitute great bodily harm is a question of fact. Therefore, we will not reverse the trial court's findings as long as they are supported by the evidence. *Id.* ¶ 15.

¶ 72    The defendant correctly points out that the mere fact that Dunn's injuries were inflicted with a knife does not necessarily mean that they rose to the level of great bodily harm. See, *e.g.*, *In re J.A.*, 336 Ill. App. 3d 814, 818-19 (2003); *In re T.G.*, 285 Ill. App. 3d 838, 846 (1996). In *J.A.*, for example, the appellate court found that a single stab wound did not constitute great bodily harm where the victim testified that the wound felt like somebody had pinched him and where there was no evidence that the wound bled. *J.A.*, 336 Ill. App. 3d at 818. In this case, however, we believe that the evidence was more than adequate to support the trial court's finding. Dunn sustained multiple knife wounds and at least one large bruise. See *id.* at 817

21

(distinguishing the facts of *J.A.* from a case in which the victim sustained multiple bruises from "repeated blows"). Here, unlike in *J.A.*, there was evidence that Dunn's knife wounds bled and that they caused her enough pain to require prescription pain medications.

¶ 73    It is also worth noting that *J.A.* involved an adjudication of delinquency on a charge of aggravated battery predicated on great bodily harm. *Id.* at 815. Because great bodily harm was an element of the offense as charged (*id.*), the State was required to prove beyond a reasonable doubt that the defendant inflicted great bodily harm (*id.* at 818). This case, by contrast, involves a finding made by the trial court at sentencing, when the State's burden of proof is lower. See *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14.

¶ 74    We find the evidence in this case to be far more similar to the evidence regarding the nature and extent of a crime victim's injuries in *Lopez-Bonilla*. There, the victim was struck multiple times and sustained multiple injuries (*id.* ¶¶ 18-19), primarily lacerations (*id.* ¶ 7). He testified that he felt like he might lose consciousness during the attack and that he bled enough to feel the blood coming out. *Id.* ¶ 18. He further testified that he experienced pain for some time after the attack (*id.* ¶ 7), although he did not describe the level of pain or testify to how long it lasted (*id.* ¶ 19). The appeals court found that "it was reasonable for the [trial] court to conclude that the cumulative evidence showed that great bodily harm occurred." *Id.* ¶ 19.

¶ 75    The injuries in this case likely did not cause as much bleeding as those in *Lopez-Bonilla*. See *id.* ¶¶ 7, 18 (noting that the victim was placed face down in his own blood). However, as stated previously, the crime scene photographs did reveal significant bloodstains. In addition, there was evidence that Dunn sustained multiple knife wounds, most of which required the use of Steri-Strips for closure, and evidence of two bruises, including a significant bruise to the back of Dunn's head. There was also evidence that Dunn lost consciousness during the attack and

evidence that she experienced pain that was intense enough to require treatment with prescription pain medications. Like the appellate court in *Lopez-Bonilla*, we cannot say that the trial court's decision that this cumulative evidence established great bodily harm was unreasonable or against the manifest weight of the evidence.

¶ 76          D. Severe Bodily Injury and Mandatory Consecutive Sentences

¶ 77    The defendant's final argument is that the court erred in finding that Dunn's injuries reached the level of severe bodily injury, thereby triggering the requirement of consecutive sentences. We reject this contention.

¶ 78    Generally, when a court imposes sentences for multiple offenses at the same time, the sentences are to run concurrently. *People v. Alvarez*, 2016 IL App (2d) 140364, ¶ 18 (citing 730 ILCS 5/5-8-4(a) (West 2008)). This case involves an exception to that general rule. Consecutive sentences are mandatory when a defendant is convicted of a Class X or Class 1 felony and the sentencing court finds that the defendant inflicted "severe bodily injury" during the commission of that felony. 730 ILCS 5/5-8-4(d)(1) (West 2016); see also *Alvarez*, 2016 IL App (2d) 140364, ¶ 18.

¶ 79    Illinois appellate courts have interpreted the phrase "severe bodily injury" differently. See *id.* ¶¶ 22-23. The Fourth District held that "[t]he difference between 'great bodily harm' and 'severe bodily injury' is merely semantic." *People v. Witherspoon*, 379 Ill. App. 3d 298, 308 (2008). The First and Second Districts, however, have both held that a finding of severe bodily injury requires proof of a degree of harm that is something more than the degree of harm needed to sustain a finding of great bodily harm. *Alvarez*, 2016 IL App (2d) 140364, ¶¶ 23-24; *People v. Williams*, 335 Ill. App. 3d 596, 600 (2002). The trial court in this case chose the latter approach, and we agree with this decision.

23

¶ 80    In *Williams*, the First District noted that "the legislature chose the phrase 'great bodily harm' when it enacted the aggravated battery statute (720 ILCS 5/12-4(a) (West 2000)), while it used the phrase 'severe bodily injury' in" the statute mandating consecutive sentences. *Williams*, 335 Ill. App. 3d at 599. The court explained that when "the legislature uses certain words in one instance and different words in another, different results were intended." *Id.* at 599-600. The court further explained that "[b]ecause 'great bodily harm' defines an offense, while 'severe bodily injury' mandates consecutive sentencing, we conclude [that] 'severe bodily injury' requires a degree of harm to the victim that is something more than that required to create the aggravated battery offense." *Id.* at 600.

¶ 81    In *Alvarez*, the Second District found the *Williams* court's reasoning persuasive. *Alvarez*, 2016 IL App (2d) 140364, ¶ 22. The *Alvarez* court then went on to explain that the concept of "great bodily harm" in the context of determining the applicability of a sentence enhancement similarly involves "distinct considerations" from the concept of "severe bodily injury" in the context of mandatory consecutive sentencing. *Id.* ¶ 24. The court therefore concluded that a finding of "great bodily harm" for purposes of a sentence enhancement does not automatically require a finding of "severe bodily injury" for purposes of mandatory consecutive sentences. *Id.* Because we find the rationale of the *Williams* and *Alvarez* courts persuasive, we conclude that the trial court correctly determined that "severe bodily injury" is something more than "great bodily harm." We therefore turn our attention to the question of whether the court erred in finding that Dunn's injuries rose to that level in this case.

¶ 82    Whether severe bodily injury has occurred is a question of fact. *People v. Deleon*, 227 Ill. 2d 322, 331-32 (2008). As such, we will reverse the trial court's findings on that question only if they are against the manifest weight of the evidence. *Id.* at 332. Under that standard, "we give

24

deference to the trial court as the finder of fact because it [was] in the best position to observe the conduct and demeanor of the parties and witnesses." *Id.* We will not substitute our judgment for that of the trial court on questions of witness credibility, the weight to be given to various pieces of evidence, or the inferences to be drawn from the evidence. *Id.*

¶ 83 The defendant points to several cases in which appellate courts have reversed findings of severe bodily injury or upheld findings that severe bodily injury was not present under circumstances involving injuries he asserts are similar to or more substantial than those sustained by Dunn in this case. See, *e.g.*, *People v. Jones*, 323 Ill. App. 3d 451, 461 (2001) (reversing a finding of severe bodily injury where a bullet grazed the victim's cheek, requiring a bandage but no other medical attention); *People v. Rice*, 321 Ill. App. 3d 475, 477-78 (2001) (affirming a finding that the victim's injuries did not constitute severe bodily injury where the gunshot victim was hospitalized for two days); *People v. Murray*, 312 Ill. App. 3d 685, 694 (2000) (reversing a finding of severe bodily injury where the victim continued running after a gunshot wound fractured his toe and where he was treated and released within hours of the shooting); *People v. Ruiz*, 312 Ill. App. 3d 49, 62-63 (2000) (reversing a finding of severe bodily injury where a police officer suffered a gunshot wound to his knee that was "barely visible" in a photograph taken that day and where he went to a police roundtable meeting before seeking medical treatment). We do not believe these cases require us to reverse the trial court's finding in this case.

¶ 84 It is worth noting that appellate courts have upheld findings of severe bodily injury or remanded for findings on that question in cases involving injuries which, like Dunn's injuries in this case, required fairly minimal treatment. See, *e.g.*, *Alvarez*, 2016 IL App (2d) 140364, ¶¶ 10, 28-29 (finding it necessary to remand for factual findings on the question of severe bodily injury

where a shooting victim was released from the hospital within hours and instructed to clean his wounds); *Witherspoon*, 379 Ill. App. 3d at 310 (upholding a finding that bruises to a victim's legs, ankle, and arms constituted severe bodily injury where the injuries "were extremely painful" and the victim was told to stay off her feet for four days)[2]; *Williams*, 335 Ill. App. 3d at 601 (remanding for factual findings on the question of severe bodily injury where two shooting victims did not receive immediate medical treatment for their injuries and where one was released from the hospital immediately after doctors cleaned his wound and the other was released after five or six hours).

¶ 85     More importantly, however, the "comparative approach" taken by the defendant is somewhat problematic because "our standard of review is deferential." *Witherspoon*, 379 Ill. App. 3d at 310. Sometimes, a finding that a victim's injuries constitute severe bodily injury may be "rationally defensible" even though the opposite conclusion would likewise be "rationally defensible." *Id*. As stated previously, we may not reverse a trial court's determination that a crime victim suffered severe bodily injury unless that finding is against the manifest weight of the evidence. *Deleon*, 227 Ill. 2d at 332. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented." *Alvarez*, 2016 IL App (2d) 140364, ¶ 19 (citing *Deleon*, 227 Ill. 2d at 332).

¶ 86     Here, as previously discussed, the court stated on the record its reasons for finding that Dunn's injuries constituted severe bodily injury when it addressed that question at the hearing on the motion to reconsider sentence. In doing so, the court described the lacerations inflicted on Dunn due to the defendant's use of a knife. Although not discussed in as much detail, the court

---

[2]We note, however, that the *Witherspoon* court held that severe bodily harm does not require a finding of harm that is any greater than that needed to support a finding of great bodily injury. *Witherspoon*, 379 Ill. App. 3d at 308.

also stated on the record that it was relying on the evidence that Dunn was thrown around. There is no real dispute that Dunn sustained a severe bruise to the back of her head as a result of the attack. We cannot say that these findings were arbitrary, unreasonable, or not based on the evidence. As such, they were not against the manifest weight of the evidence.

¶ 87                                    III. CONCLUSION

¶ 88    For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 89    Affirmed.


¶ 90    JUSTICE CATES, specially concurring:

¶ 91    I concur in the result reached by my colleagues in this case. I write separately to offer a clarification of the majority's statement concerning our review of the defendant's Rule 431(b) claim. The majority initially indicates that it will not consider the defendant's claim under the plain error doctrine (*supra* ¶ 62), but then goes on to conduct a plain error analysis (*supra* ¶¶ 65-66). In conducting the plain error analysis, my colleagues have, in essence, reviewed the defendant's claim for plain error. Indeed, plain error review was appropriate in this case.

¶ 92    A defendant preserves a claim of error for review by both objecting at trial and including the alleged error in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Here, the defendant did not object to the trial court's failure to comply with Rule 431(b) or include the issue in any posttrial motion. Appellate review of the defendant's claim of error has, therefore, been forfeited. The defendant asked this court, however, to review his claim for plain error.

¶ 93    The plain error doctrine bypasses normal forfeiture principles and allows reviewing courts to consider unpreserved claims of error in specific circumstances. *People v. Averett*, 237

Ill. 2d 1, 18 (2010). Under the plain error doctrine, the court first considers whether an error occurred. Here, as recognized by the majority, the State conceded that the trial court erred in its Rule 431(b) admonishment to the venire panel. The majority then turned its attention to the plain error analysis. In the discussion of plain error, the majority correctly concluded that only the first prong of the analysis is applicable here, *i.e.*, whether the evidence was so closely balanced that the asserted error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Upon reviewing the evidence, the majority determined that the evidence in this case was not closely balanced. I agree.

¶ 94   Here, despite the lighting inadequacies argued by the defendant, Dunn was always clear in her identification of the defendant. The *Biggers* factors weigh heavily in favor of supporting the credibility of the identification of the defendant. Under the plain error doctrine, the burden of persuasion lies with the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Inasmuch as the evidence was not closely balanced, the defendant has failed to carry his burden of persuasion that plain error occurred.

¶ 95   I agree with the majority's analysis in all other respects and would affirm the defendant's convictions and sentences.